IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DAVID LEAVY,

    Plaintiff,

v.     Civ. No. 23-991 KK/DLM

BNSF RAILWAY COMPANY,

    Defendant.

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant BNSF Railway Company's Motion to Enforce Settlement Agreement (Doc. 48) ("Motion"), filed November 21, 2024. The Court, having reviewed the parties' submissions, the record, and the relevant law, FINDS that the Motion is not well-taken and should be DENIED.

### I. Factual Background

Plaintiff David Leavy alleges that he fell and severely injured his ankle on October 21, 2022, while working for Defendant BNSF Railway Company in Belen, New Mexico. (Doc. 1 at 2.) Plaintiff claims that he fell because Defendant negligently laid and maintained the surface on which he was required to walk while performing his job duties. (*Id.*) On this basis, Plaintiff asserts a civil claim for damages against Defendant under the Federal Employers' Liability Act. (*Id.* at 2-3.) For purposes of the present Motion, the following facts are undisputed unless otherwise noted.

In March and early April of 2023, Plaintiff and Defendant's claims representative Bryan Hite engaged in settlement negotiations related to Plaintiff's ankle injury. (Doc. 48-1 at 1-11.) On March 10, 2023, Plaintiff wrote to Mr. Hite requesting compensation in the amount of twice his past lost wages, plus 1.5 times his past lost wages "for pain and suffering," for a total of

$57,593.06. (*Id.* at 3.) In his March 15, 2023 response, Mr. Hite stated that "wage loss is the wage loss and I can't do twice that amount," and made a counteroffer of $16,500.[1] (*Id.* at 4.)

On March 22, 2023, Plaintiff e-mailed Mr. Hite requesting $49,500 "for [his] lost time and suffering, that [he] had to endure for the time [he] lost from work." (*Id.* at 6.) Responding on March 27, 2023, Mr. Hite stated that he "want[ed] to take care of [Plaintiff] and resolve this matter quickly to make [Plaintiff] whole," and countered with an offer to settle for $20,000. (*Id.* at 7.) Later that day, Plaintiff echoed Mr. Hite's desire "to resolve this matter quickly" and offered to "meet [Mr. Hite] in the middle" at $35,600. (*Id.* at 8.)

On April 3, 2023, Mr. Hite proposed a settlement amount of $22,500, expressing his belief that this amount was "very fair" because it was "above not only net wage loss but also above gross wage loss." (*Id.* at 9.) Plaintiff responded by e-mail later that day, stating:

> [I] am going to come down on my offer for a settlement of $25600[.] I believe this offer is fair for both of us[] and would gladly take this amount with no more counter offers from me[.] I could live with this offer if you are willing to accept it so we can bring this matter to a close[.]

(*Id.* at 10.) On April 4, 2023, Mr. Hite sent a responsive e-mail, stating, "I can make the $25,600 happen for you. I will work on drafting a release that will have to be signed. I will email it over once it's ready." (*Id.* at 11.)

Mr. Hite had mentioned a written release to Plaintiff before April 4, 2023, but Plaintiff never agreed to it. (Doc. 49-2 at 3.) Mr. Hite never discussed the proposed terms of the release with Plaintiff and never sent the release to him. (*Id.*) In particular, Plaintiff and Mr. Hite did not discuss or agree on "what [Plaintiff] was specifically releasing Defendant from." (*Id.* at 5.) To

---

[1] Plaintiff's lost wages at the time amounted to $16,455.16, assuming Plaintiff was correct in asserting that $57,593.06 was 3.5 times those lost wages. (Doc. 48-1 at 3.) Thus, Mr. Hite's initial counteroffer of $16,500 was about $45 over the amount of Plaintiff's past lost wages.

2

date, Plaintiff does "not know what Mr. Hite and [Defendant] were asking [him] to agree to" in the proposed release. (*Id.* at 4.) However, Plaintiff was "prepared to sign the documents confirming" his and Mr. Hite's "agreement and settlement" until he learned that he needed surgery for his ankle injury. (Doc. 48-2 at 3.)

Plaintiff had a doctor's appointment scheduled for a few days after April 4, 2023. (Doc. 49-2 at 4.) He and Mr. Hite "discussed holding off on doing everything until after [the] appointment because of the insurance would only cover [Plaintiff] for so long after if [they] signed an agreement."[2] (Doc. 48-2 at 2.) At the appointment, Plaintiff learned that he needed surgery for his injury. (*Id.* at 3.) When Plaintiff called to tell Mr. Hite that he needed surgery and would likely need to miss more work, they agreed that they "should hold off on finalizing the settlement [they] were negotiating until more developments occurred with [Plaintiff's] recovery." (Doc. 49-2 at 4; *see also* Doc. 48-2 at 3.)

Plaintiff's injury has resulted in two surgeries to date, on July 11, 2023, and November 26, 2024. (Doc. 49-2 at 2.) Plaintiff hired counsel soon after his first surgery, and his counsel "took over further negotiations with Mr. Hite." (*Id.* at 4.)

Plaintiff filed this action on November 9, 2023. (Doc. 1.) From December 2023 to April 2024, Plaintiff's counsel and Mr. Hite engaged in negotiations to settle the case. (Doc. 49-1 at 2-22.) The proposed settlement amounts in their offers and counteroffers were significantly higher than $25,600. (*Id.*) In the course of these negotiations, Mr. Hite observed that Plaintiff had "agree[d]" to "settle [his] claim" for "$26,500 [sic]" on April 4, 2023, after he had been off work for 103 days, but that he had subsequently been off work for another 127 days, resulting in more lost wages. (*Id.* at 9-10.) In his communications to Mr. Hite, Plaintiff's counsel consistently

---

[2] The parties' submissions do not indicate the source of the insurance to which Plaintiff referred or what kind of coverage it provided. (*See generally* Docs. 48, 49, 52.)

3

indicated that in exchange for the amounts he proposed, Plaintiff would "release his claims against [Defendant] and agree to indemnify [Defendant], excluding costs of defense, from claims made by, through, or under him." (*Id.* at 2-21.)

Sometime before April 2024, Defendant lost Plaintiff's and Mr. Hite's 2023 settlement correspondence due to a computer error. (Doc. 48 at 2; Doc. 52 at 7.) In April 2024, Defendant served discovery requests on Plaintiff, seeking documents that encompassed this correspondence. (Doc. 48 at 2; Doc. 52 at 7-8.) However, Plaintiff's responsive production did not include the e-mails he and Mr. Hite had exchanged on April 3 and 4, 2023. (*Id.*) Plaintiff ultimately produced those e-mails on October 9, 2024, in response to another set of discovery requests Defendant served in September 2024. (Doc. 52 at 8.)

## II. Legal Standards

A federal district court "has the power to summarily enforce a settlement agreement entered into by the litigants while the litigation is pending before it." *United States v. Hardage*, 982 F.2d 1491, 1496 (10th Cir. 1993). To decide a motion seeking such relief, the court must have "a sufficient factual foundation," which may come from "sworn testimony, subject to cross-examination, or sworn affidavits or briefing." *Id.* at 1497. "[W]here material facts concerning the existence or terms of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing." *Devon Energy Prod. Co., L.P. v. Line Finders, LLC*, 2022 WL 4232404, at *5 (10th Cir. Sept. 14, 2022). However, when there are no material factual disputes and only "the legal implications of the parties' conduct" are at issue, no evidentiary hearing is required.[3] *Id.* at *5–*6.

---

[3] In its reply, Defendant argues that, "[t]o the extent the Court determines that there exist disputes of fact preventing enforcement of the agreement at this time, the Court must submit the issue to the jury to determine those facts and enforce the agreement." (Doc. 52 at 1, 11.) However, not only is this argument contrary to Tenth Circuit precedent, but also the decision Defendant cites in support is inapposite because it concerned a motion for summary judgment

4

"Because settlement agreements are contracts, issues involving the formation and construction of a purported settlement agreement are resolved by applying state contract law." *Walters v. Wal-Mart Stores, Inc.*, 703 F.3d 1167, 1172 (10th Cir. 2013) (quoting *Shoels v. Klebold*, 375 F.3d 1054, 1060 (10th Cir. 2004)) (quotation marks and brackets omitted). For a contract to be legally enforceable under New Mexico law,[4] it "must be factually supported by an offer, an acceptance, consideration, and mutual assent." *Hartbarger v. Frank Paxton Co.*, 1993-NMSC-029, ¶ 7, 857 P.2d 776, 780.

"An offer is a communication of a willingness to enter into a contract." N.M. U.J.I. 13-805. To constitute an offer, a communication must satisfy four conditions: (1) it must make a proposal showing the offeror's willingness to contract; (2) its material terms must be reasonably certain; (3) its terms must have been communicated to the offeree; and, (4) the offeror must have intended to give the offeree the power to create a contract by accepting it. *Id.*

An acceptance, in turn, is a statement or conduct by the offeree, showing to the offeror the offeree's agreement to the terms of the offer. N.M. U.J.I. Rule 13-807. "An acceptance must be clear, positive and unambiguous." *Tatsch v. Hamilton-Erickson Mfg. Co.*, 1966-NMSC-193, ¶ 10, 418 P.2d 187, 189. More particularly,

> an acceptance requires manifestation of unconditional agreement to all of the terms of the offer and an intention to be bound thereby. Such manifestation may be either written or oral or by actions and conduct or a combination thereof, but regardless of the form or means used, there must be made manifest a definite intention to

---

on a claim of universal accord and satisfaction, not a motion to enforce a settlement. (*See id.* at 11 (citing *Bennett v. Kisluk*, 1991-NMSC-060, ¶ 6, 814 P.2d 89, 91).)

[4] Both parties rely on New Mexico contract law in their briefing on the present Motion. (Docs. 48, 49, 52.) Thus, and because Plaintiff and Mr. Hite negotiated the purported settlement at issue in New Mexico, the Court will apply New Mexico law to determine whether the parties formed a valid settlement agreement. (*See* Doc. 48-1 at 1-11; Doc. 49-2 at 2); *see also Flemma v. Halliburton Energy Servs., Inc.*, 2013-NMSC-022, ¶ 14, 303 P.3d 814, 819 ("As a general proposition of law, it is settled that the validity of a contract must be determined by the law of the state in which it was made.").

5

accept the offer and every part thereof and be presently bound thereby without material reservations or conditions.

*Silva v. Noble*, 1973-NMSC-106, ¶ 6, 515 P.2d 1281, 1283; *see also Corr v. Braasch*, 1981-NMSC-137, ¶ 5, 639 P.2d 566, 567 ("For there to be a contract, the offer must be accepted unconditionally and unqualifiedly by the offeree. The acceptance must be to all terms.") (citation omitted). "A reply to an offer which adds qualifications or requires performance of conditions is not an 'acceptance,' but rather a counter-offer." *Corr*, 1981-NMSC-137, ¶ 9, 639 P.2d at 568.

The third element of a contract, *i.e.*, consideration, is any bargained-for benefit to the offeror, or detriment to the offeree, that motivated the offeror to enter into the contract. N.M. U.J.I. 13-814.

Finally, to satisfy the fourth element of a contract, *i.e.*, mutual assent, "there must be an objective manifestation of mutual assent by the parties to the material terms of the contract." *Pope v. Gap, Inc.*, 1998-NMCA-103, ¶ 11, 961 P.2d 1283, 1286-87. Mutual assent is not based on "the private, undisclosed thoughts of the parties," *id.* at ¶ 13, 961 P.2d at 1287, and "[u]nexpressed intentions or understandings … will not be given operative effect in deciding what the parties agreed to." *Myers v. Papa Texas, LLC*, 749 F. Supp. 3d 1165, 1174 (D.N.M. 2024) *(*quoting *Pollock v. Thompson,* 2024-NMCA-045, ¶ 23, 550 P.3d 888, 896); *see also Trujillo v. Glen Falls Ins. Co.*, 1975-NMSC-046, ¶ 7, 540 P.2d 209, 211 ("The apparent mutual assent, essential to the formation of a contract, must be gathered from the language employed by [the parties], or manifested by their words or acts.").

The party seeking judicial enforcement of a contract bears the burden of persuading the court that a valid contract exists. *Flemma v. Halliburton Energy Servs., Inc.*, 2013-NMSC-022, ¶ 28, 303 P.3d 814, 822; *Farmington Police Officers Ass'n Commc'n Workers of Am. Loc. 7911 v. City of Farmington*, 2006-NMCA-077, ¶ 16, 137 P.3d 1204, 1210. Thus, "[a] party seeking

judgment on the basis of compromise and settlement has the burden of establishing assent by the opposing party." *Augustus v. John Williams & Assocs., Inc.*, 1979-NMSC-002, ¶ 9, 589 P.2d 1028, 1030. However, New Mexico public policy strongly favors settlements, and once a valid settlement agreement has been proven, a party seeking to set it aside bears the burden to show a compelling basis for doing so. *Marrujo v. Chavez*, 1967-NMSC-059, ¶ 7, 426 P.2d 199, 201; *Builders Contract Interiors, Inc. v. Hi-Lo Indus., Inc.*, 2006-NMCA-053, ¶ 7, 134 P.3d 795, 798; *Herrera v. Herrera*, 1999-NMCA-034, ¶ 17, 974 P.2d 675, 680; *Gonzales v. Atnip*, 1984-NMCA-128, ¶ 1, 692 P.2d 1343, 1344. That a settlement agreement later "proves to have been unwise or unfortunate" is not enough to justify such relief. *Herrera v. C & R Paving Co.*, 1963-NMSC-203, ¶ 5, 387 P.2d 339, 341; *In re Tocci*, 1941-NMSC-015, ¶ 28, 112 P.2d 515, 521; *Environmental Control, Inc. v. City of Santa Fe*, 2002-NMCA-003, ¶ 19, 38 P.3d 891, 897.

### III. Analysis

In its Motion, Defendant argues that the parties entered into a binding settlement agreement on April 3 and 4, 2023, and that the Court should summarily enforce this agreement. (Doc. 48.) In support, Defendant contends that Plaintiff, in his April 3 e-mail, offered to settle his claims against Defendant for $25,600, and Mr. Hite, in his April 4 e-mail, accepted Plaintiff's offer. (*Id.* at 3-6.) Plaintiff disagrees, arguing that these e-mails merely show preliminary agreement on a number, and that the parties' failure to agree to the execution of a release or to release terms precluded the formation of an enforceable contract. (Doc. 49 at 1, 5-9.) Having reviewed the undisputed record evidence, including Plaintiff's and Mr. Hite's settlement correspondence, Plaintiff's deposition testimony, and the portions of Plaintiff's affidavit that his testimony does not contradict,[5] the Court finds that the parties did not enter into a binding settlement agreement.

---

[5] In its reply, Defendant argues that the Court should disregard the portions of Plaintiff's affidavit that his deposition testimony contradicts as a "sham." (Doc. 52 at 2-4 & n.1.) However, the Court need not decide whether any portions

7

As a preliminary matter, the Court notes that many of the decisions cited in Defendant's Motion concern the enforceability of a settlement where: (a) the party disputing enforcement had signed a written settlement agreement and release; or, (b) the material terms of the parties' agreement had been documented on the record when the settlement was reached. *See, e.g.*, *Escano v. Innovative Fin. Partners, LLC*, 2024 WL 243558 (D.N.M. Jan. 23, 2024), *report and recommendation adopted*, 2024 WL 943958 (D.N.M. Mar. 5, 2024) (enforcing written settlement agreement signed by the parties); *Whitaker v. Becerra*, 2021 WL 5122067 (D.N.M. Nov. 4, 2021) (enforcing settlement agreement placed on the record following settlement conference before federal magistrate judge); *Spraggins v. Reed*, 2006 WL 1304958 (D.N.M. Jan. 30, 2006) (enforcing written settlement agreement signed by the party disputing enforcement); *Rojo v. Loeper Landscaping, Inc.*, 1988-NMSC-065, 759 P.2d 194 (finding that written settlement agreement signed by the parties was binding); *In re Tocci*, 1941-NMSC-015, 112 P.2d at 515 (affirming denial of motion to set aside written settlement agreement signed by the parties); *Builders Contract Interiors, Inc.*, 2006-NMCA-053, 134 P.3d at 795 (upholding written settlement agreement signed by the parties); *Esquibel v. Brown Const. Co.*, 1973-NMCA-111, 513 P.2d 1269 (affirming enforcement of settlement where plaintiff had testified to settlement's terms immediately after settlement was reached).

Here, in contrast, it is undisputed that Plaintiff never executed—or even received a draft of—a written settlement agreement and release, and that the terms of the parties' alleged settlement were not contemporaneously documented on the record. Of course, these methods are not the only ones by which parties can reach and document a binding settlement, but they do serve a useful purpose in clearly confirming the parties' agreement to settle and the settlement's material terms.

---

of Plaintiff's affidavit that could reasonably be read to contradict his testimony are a sham, because it need not and does not rely on any such portions in denying Defendant's Motion.

8

Thus, cases in which courts have enforced settlements that the parties documented by these methods are materially distinguishable from this case.

Turning to the undisputed facts at issue here, the Court concludes that the parties did *not* reach a binding settlement agreement because, as explained below: (a) Mr. Hite did not accept Plaintiff's April 3 offer, but rather made a counteroffer; (b) Plaintiff did not accept Mr. Hite's counteroffer; and, (c) Plaintiff did not agree to the material terms to be included in the release Mr. Hite proposed to draft.

### A.    *Mr. Hite did not accept Plaintiff's April 3 offer, but rather made a counteroffer.*

The undisputed record evidence shows that, on April 3, 2023, Plaintiff sent Mr. Hite an e-mail in which he extended a settlement offer of $25,600. (Doc. 48-1 at 10.) However, the undisputed evidence also shows that Mr. Hite did not accept Plaintiff's offer unconditionally, as required to give rise to an enforceable contract. *Corr*, 1981-NMSC-137, ¶ 5, 639 P.2d at 567; *Silva*, 1973-NMSC-106, ¶ 6, 515 P.2d at 1283; *Tatsch*, 1966-NMSC-193, ¶¶ 9-10, 418 P.2d at 189. Rather, in his April 4, 2023, e-mail, Mr. Hite conditioned his acceptance by adding a new term to Plaintiff's offer, *i.e.*, the execution of a written release Mr. Hite proposed to draft. (*See* Doc. 48-1 at 11.) Specifically, Mr. Hite stated that he was able to "make the $25,600 happen," but then added that he would work on drafting "a release that will have to be signed." (*Id.*)

Moreover, the undisputed evidence shows that Plaintiff's execution of the proposed release was, for Defendant, a material term of the settlement the parties were trying to reach. "A material term is any term without which [a party] would not have entered into the contract." N.M. U.J.I. 13-802. And by stating that the proposed release would have to be signed, Mr. Hite clearly and objectively indicated that Defendant would not agree to Plaintiff's April 3 offer if Plaintiff refused to sign the release. Because Mr. Hite added a new, material term to Plaintiff's April 3 offer, his

April 4 e-mail was not an acceptance of Plaintiff's offer, but rather was a counteroffer.[6, 7] *Corr*, 1981-NMSC-137, ¶ 9, 639 P.2d at 568; *see also Fratello v. Socorro Elec. Co-op, Inc.*, 1988-NMSC-058, ¶ 8, 758 P.2d 792, 795 (stipulation of dismissal that offeree's counsel submitted to offeror "added a significant additional term to the parties' attempted settlement agreement, and [was] thus to be considered a counter-offer to [the offeror's] offer to settle").

### B. Plaintiff did not accept Mr. Hite's April 4 counteroffer.

Second, the undisputed record evidence shows that Plaintiff did not accept Mr. Hite's April 4 counteroffer. Plaintiff has specifically attested that he never agreed to a release and that Mr. Hite never discussed release terms with him or sent a draft release to him. (Doc. 49-2 at 3-4.) Nor has Defendant submitted any evidence that contradicts Plaintiff's attestation on these points.

Defendant did submit an excerpt from Plaintiff's deposition in which Plaintiff testified that he was "prepared" to sign documents "confirming [his and Mr. Hite's] agreement and settlement" before he learned that he needed surgery. (Doc. 48-2 at 3.) However, as noted above, to accept an offer, the offeree must make "manifest," by his words or conduct, "a definite intention to accept the offer and every part thereof and be presently bound thereby without material reservations or

---

[6] Of course, a conditional response to an offer will "operate[] as an acceptance of the original offer despite the additional or different terms" when "the new terms were reasonably implied by the original offer." N.M. U.J.I. 13-808. But here, Defendant has not shown that Plaintiff's offer reasonably implied that he would execute the release Mr. Hite proposed to draft, because it has not shown what the material terms of the proposed release were to be.

[7] Defendant argues that "to the extent [its] prior acceptance could somehow be deemed insufficient, [Defendant] again confirms herein its unconditional acceptance of Plaintiff's April 3, 2024 [sic] settlement offer in the amount of $25,600." (Doc. 48 at 4 n.2.) However, even if Defendant had not rejected Plaintiff's April 3 offer by making a counteroffer, and even if Plaintiff had not long since withdrawn the offer as shown by his counsel's subsequent offers to settle for significantly higher amounts, the request for relief in Defendant's Motion belies Defendant's claimed willingness to accept Plaintiff's *pro se* offer unconditionally. Specifically, in its Motion, Defendant asks the Court not only to enforce the agreed-upon settlement amount, but also to require the execution of an "appropriate" release. (*Id.* at 8.) In other words, Defendant continues to condition its acceptance of Plaintiff's April 3 offer on Plaintiff's execution of an inchoate release. It is unsurprising that this term remains material to Defendant; as the Seventh Circuit observed, "many defendants would agree that the *most* material term in any settlement agreement is the release." *Higbee v. Sentry Ins. Co.*, 253 F.3d 994, 997–98 (7th Cir. 2001) (emphasis in original).

conditions." *Silva*, 1973-NMSC-106, ¶ 6, 515 P.2d at 1283. And here, Defendant has submitted no evidence to show that Plaintiff ever objectively manifested his willingness to sign the release Mr. Hite proposed to draft without material reservations or conditions. (*See generally* Docs. 48, 52.) Indeed, the deposition excerpt Defendant submitted tends to show the contrary. Specifically, as noted in Section I., *supra*, Plaintiff testified in the excerpt that: (a) he and Mr. Hite "discussed holding off on doing everything" until after an upcoming doctor's appointment; and, (b) after the appointment, he and Mr. Hite "agreed that everything should be put on hold" until they had more information about Plaintiff's damages. (Doc. 48-2 at 2-3.)

### C. *Plaintiff did not accept the material terms to be included in the proposed release.*

Finally, the undisputed evidence shows that Plaintiff did not accept the material terms to be included in the release Mr. Hite proposed to draft. Defendant argues that, even if Plaintiff did not agree to all of the terms to be included in the release, he did agree to the only two terms that were material, *i.e.*, the settlement amount and the scope of the claims to be settled. (Doc. 48 at 6.) But this argument fails for several reasons.

First and perhaps most obviously, Defendant has not shown that all of the other terms in the proposed release would have been immaterial, because it has presented no evidence of what those other terms were to be. Further, Mr. Hite's insistence on the execution of a release shows that "the prevention of future litigation [was] one of the primary goals of [the] settlement" Defendant was seeking, and that there were inchoate but "essential terms of the release needed to achieve that goal," which likely included terms in addition to the amount and general scope of the settlement.[8] *Myers*, 749 F. Supp. 3d at 1175. Thus, even if Plaintiff did agree to the settlement's

---

[8] For example, the release may have included an indemnification agreement like the one that Plaintiff's counsel offered in exchange for significantly higher settlement amounts than those Plaintiff and Mr. Hite had discussed. (*See* Doc. 49-1 at 2-21.)

amount and scope, there is no evidence that he accepted any other material terms to be included in the proposed release.

Second, in light of the undisputed record evidence, the Court is not persuaded that Plaintiff objectively manifested unambiguous agreement to the scope of the settlement Mr. Hite offered on April 4. Rather, Plaintiff's written negotiations with Mr. Hite were objectively somewhat ambiguous regarding the scope of the claims they encompassed. True, Plaintiff expressed a desire "to resolve this matter quickly" and "bring this matter to a close," which suggests that he was seeking to settle all claims arising out of his October 2022 injury. (Doc. 48-1 at 8, 10.) However, Plaintiff also specified that he was seeking compensation "for [his] lost time and suffering, that [he] had to endure for the time [he] lost from work," with no mention of future damages, which suggests that he was only seeking to settle his claims for past damages. (*Id.* at 6.) Moreover, the latter reading would be more consistent with Mr. Hite's suggestion that he could only offer compensation for wage loss Plaintiff had already incurred. (*Id.* at 3-4.)

Third, even if Plaintiff had unambiguously agreed to both the amount and the scope of a settlement, the undisputed evidence shows that this agreement was provisional. Specifically, as previously discussed, it is undisputed that Plaintiff and Mr. Hite agreed to hold off on finalizing their agreement and to revisit it after they knew more about Plaintiff's future damages. Granted, it is unclear how, if at all, either party planned to adjust the agreement to account for such damages. But regardless, Plaintiff's testimony shows that some material part of his agreement with Mr. Hite was provisional pending the parties' receipt and assessment of additional information about damages.[9] For these reasons, the Court finds that Plaintiff did not objectively manifest

---

[9] That Plaintiff's counsel and Mr. Hite resumed exchanging settlement offers and counteroffers after Plaintiff's first surgery further evidences the provisional nature of Plaintiff's and Mr. Hite's April 2023 agreement. Defendant suggests that it engaged in these subsequent negotiations, which took place from December 2023 to April 2024, because it had lost Plaintiff's and Mr. Hite's settlement correspondence and Plaintiff improperly withheld copies of

unambiguous and unconditional acceptance of the material terms to be included in the release Mr. Hite proposed to draft.

## IV. Conclusion

Based on the undisputed record evidence regarding the parties' communications and conduct, the Court finds that the parties did not enter into a binding settlement agreement according to the terms set forth in Plaintiff's and Mr. Hite's April 3 and 4, 2023 e-mails. Mr. Hite's April 4 e-mail conditioned Defendant's acceptance of Plaintiff's April 3 offer on the execution of a release Mr. Hite had yet to draft, whose terms the parties had yet to negotiate, and was therefore a counteroffer rather than an acceptance of Plaintiff's offer. Then, Plaintiff did not accept Mr. Hite's counteroffer because he never manifested his willingness to execute the proposed release or his unambiguous, unconditional acceptance of all of its material terms. In these circumstances, the parties' agreement to a settlement amount was simply too preliminary, provisional, and incomplete to give rise to an enforceable settlement contract. The Court therefore declines to summarily enforce the purported agreement. Moreover, because Defendant has shown no genuine issue of material fact, and the Court's findings and conclusions are based solely on the legal implications of the parties' undisputed communications and conduct, Defendant is not entitled to an evidentiary hearing on its Motion. *Devon Energy Prod. Co.*, 2022 WL 4232404, at *5-*6.

---

their April 3 and 4, 2023 e-mails until October 2024. (Doc. 48 at 2; Doc. 52 at 1, 7-9.) But even if Defendant did not possess a copy of the April 3 and 4 e-mails during its subsequent negotiations with Plaintiff's counsel, Defendant's representative Mr. Hite clearly remembered their essence, not only because he read or wrote them, but also because, in one of his e-mails to Plaintiff's counsel, he specifically noted that Plaintiff had "agree[d] with [him] to settle claim on 4/4/2023 for total settlement of $26,500 [sic]." (Doc. 49-1 at 10.) The Court does not, by acknowledging the evidentiary import of Defendant's settlement negotiations with Plaintiff's counsel, intend to condone Plaintiff's alleged delay in producing the April 3 and 4 e-mails, nor does it express an opinion about any discovery sanctions to which Defendant might or might not be entitled due to the delay, except to note that Defendant has not sought any such sanctions in its Motion.

13

For all of the above reasons, Defendant BNSF Railway Company's Motion to Enforce Settlement Agreement (Doc. 48) is DENIED.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent